State of Missouri, et al. v. Joseph Biden, Jr., et al. Mr. Sauer. Thank you, Your Honor, and may it please the Court, John Sauer appearing on behalf of the State Appellants in this case. Your Honors, the Interagency Working Group at issue in this case is a very strange creature in the world of federal regulatory agencies. The government concedes, quote, that no statute establishes it nor delegates it any legislative authority. It has no statutory authority on its own. It has no delegated authority on its own. But what it purports to do is dictate the outcome of a very important legislative policy question to all the federal agencies that do possess delegated authority. And when it promulgates these interim estimates, the values for the social costs of greenhouse gases, those are binding on that critical subset of what each future agency is considering. They are being dictated. These are the numbers you have to use in those future agencies. The President's Executive Order 13990 in Section 5 is explicit on this. It says that these are the numbers which agencies, quote, shall use when monetizing the value of changes when monetizing the value of changes from greenhouse gas emissions resulting from regulations and other agency actions. The government concedes in its brief at least four times that when the agencies have the statutory authority or the discretion, so to speak, as long as the statute doesn't prohibit them from monetizing greenhouse gases, they shall do so and they shall use these specific numbers. So the government's brief at 31, 39, 40, and 41 in this case says, for example, you know, the agencies must use the interim estimates and not other estimates. These are the numbers they're being told to use, the numbers they're being told to use. Agencies will rely on the interim estimates when they otherwise have discretion to do so and so forth. So there's no dispute about that. Number one, it has no legislative authority. But number two, it's dictating the outcome of hundreds of billions of dollar policy question to all these other federal agencies when they engage in future rulemakings. Another point is not disputed in this case, which is that there was no opportunity for public notice and comment up until February 26, 2021, when the Interagency Working Group promulgated the interim estimates. So there was no opportunity for notice and comment. And, you know, our evidence showed, we submitted to the district court, that we were actually monitoring, you know, on a near daily basis the websites to try and have the opportunity to comment on the interim estimates, and we were denied that opportunity. Can I ask you, when you ultimately were afforded the opportunity to comment in March or May, and 11 of the plaintiffs did so, why isn't that a sufficient remedy for your APA claim? Because what we're commenting on in that is not the current values that are now binding federal agencies. What we're allowed to comment on is the second phase. There's the interim estimates, which are final for the current purposes and have been final for the last year and a half, roughly. But there's a second set of numbers that is coming out. It was actually supposed to come out last January, but it's been delayed. And the executive order says, hey, you're going to do two sets of numbers. Immediately, within 30 days of the executive order, issued the so-called interim estimates, which are really final for APA purposes, because they're already binding agencies for the current year and a half. But then, over the summer, there was a notice in comment where we did submit comments, and that relates to what will be the final, final numbers. That's a different set of numbers. Those will only bind agencies for the future regulatory actions that post-date whenever we actually get those numbers. So far, we haven't had them yet. Again, the executive order calls. So we were commenting on something totally different, really. We were deprived of the opportunity to comment on these numbers, which are binding and have bound at least 14 major regulatory actions, have bound federal agencies as they go forward. Those went through notice and comment, though, didn't they? The numbers themselves, weren't those the same numbers that were in the Obama administration? The Obama administration conducted notice and comments on predecessors to these numbers in 2013, but they never accepted comments on the underlying methodology. So they said, oh, you guys had an opportunity to comment back in 2013 about these. But, of course, they didn't, because people did submit comments, like we did. We're challenging the methodology that underlies the IAMs, which is kind of the guts. I have to say, counsel, in the public court, if you put your hands behind your back, it's a lot more effective. Sorry, Your Honor. I'll do that for the rest of the argument. And I apologize. It must be an Italian in me. The jury instincts in all of us. So the only time any public comment was conducted, anything related to these, was in 2013. The Obama administration opened this up to public comment. People did submit comments that said, hey, the methodologies of these IAMs, the DICE page and fund models that this is all based on, that methodology is profoundly flawed. And they issued a statement saying, no, no, we're clarifying that we're not accepting comments on the methodologies underlying the IAMs. This is in our reply brief. And so there really has never been, even if seven years earlier, we were conducting notice and comment in a prior administration, would have been sufficient to offer us a deal with our procedural issue, which we have disputed. There really has never been an opportunity for notice and public comment on the critical question of, what's the methodologies? We submitted the Dyer-Ratner Declaration to the district court, which goes through five major criticisms of the underlying methodologies for the three IAMs. Sir, can I interject? You've talked about the lack of comment. And you mentioned, you talk real fast. But I think you said that these interim numbers have already been utilized in 14 different regulatory decisions. Have your plaintiff members then commented on those regulatory decisions? Several of them, yes. So, for example, we've submitted comments on this to FERC, to Department of Transportation, EPA, and obviously to the Interagency Working Group itself. And in those EPA-mandated objections to those regulations, in addition to whatever additional things are in those regulations, did your plaintiff participants comment on the use of these numbers? Absolutely, yes. We submitted arguments similar. I think we actually submitted the Dyer-Ratner Declaration for at least three of those. But we're making the same claims. But, of course, the deck is stacked against us when the second agency act. Because we can comment to our heart's content to EPA or Department of Transportation, saying, hey, look, these are bad numbers. They're based on a flawed methodology. You shouldn't use them at all. And they say, okay, thank you very much. We appreciate your comments. But you know what? The Executive Order 13990, Section 5, says we must use these numbers. Was that the response? There has been no response so far that I'm aware of. So I don't have an answer to that in terms of – in other words, I don't think we've gotten that far yet. But in any event, what the government has said in its brief here, again, at pages 31, 39, 40, 41, is that they must use these numbers. So we can attack the methodology. We have this sort of illusory procedural right to attack the methodology before the second agency, when, of course, the second agency is bound by what the first agency did, you know, this kind of strange animal, the interagency working group as it is. And so we have no need –  A strange creature, I might call it. No, interagency working groups have been around since the start of the executive branch, I dare say. Not interagency working groups that can dictate specific numbers on a policy outcome, on a legislative question of enormous practical import. I'm not aware of any precedent for that. So the government discusses interagency working groups that do – What about the mandatory oil import program? I'm not aware of having anything like this kind of – where there is something that has no delegated authority. Half of my time on the White House staff was spent on that interagency working group that was part of the executive office of the President, but not created by statute. And I submit to the Court that that is not akin to what we have here. We have an interagency working group that's doing something totally different. You can submit that, but I lived it. Well, I defer to the Court's superior knowledge and experience with that particular program. However, this program is doing something new. The government hasn't cited any historical antecedent for it. What it is doing is it's saying it has no delegated authority. There's no statute that says you can have this interagency working group. It's fine if an interagency working group wants to make recommendations and so forth, but this one is dictating to agencies that do have statutory authority, where Congress has said, EPA, you consider this problem. And the interagency working group that has no delegated authority said you must do it a certain way on a question of enormous practical importance. I don't think there's any antecedent for that. In the 14 examples that you have of agencies utilizing these numbers that have the APA violation that you've described, have you pointed to ways in which the conclusions were impacted specifically by the new numbers? I'm not sure I understand the question. And I might not understand your argument. But you said that in 14 instances, these values have already been put into place, and you're objecting to each of those as they come up. Not every one, but yes. Or to several of them as they come up. Can you quantify or point to the extent to which the use of the interim values mandated by this executive order influenced the regulatory action in those cases? Yes, and there's some discussion of that in our reply brief. This hadn't happened at the time we filed our opening brief. But, for example, in the light truck emission standards that EPA and DOT issued, I believe, last December, our brief goes on to point out that, for example, there there was a calculation that the social cost of greenhouse gases could be as high as something in the $200 billion. So that was essentially the benefit of imposing more stringent standards. And that was used to justify costs I think that are in the neighborhood of $26 billion, of which purchasers are going to have to pay more money to buy cars now. And this is the high point. Sorry, go ahead. No, no, I'm sorry, I interrupted you. I just am trying to make sure I understand which ones you're talking about. This is the hydrofluoric carbons example? Those would both apply. The one I was discussing was the other one, which is the light truck example. So EPA issued new emission standards for light-duty vehicles. I'm calling them light trucks. That's really not the right word. It's, I believe, light-duty vehicles. And those are emission standards going forward where a whopping number for the social cost of greenhouse gases. Could the President tell the Secretary of Interior you must use these numbers in considering oil and gas lease applications? That would be a different case than this one, but likely would still raise separation of powers problems. If Congress says, Secretary of the Interior, please address this policy situation. And the Secretary, well, I can't do that, Mr. President. He says, then I'll find a different Secretary of Interior. The President does have that kind of overall supervisory control over the agencies, but what he does not have is a delegation of authority. It's a lot more than overall. I think this is a lot like the case in Youngstown, Your Honor, where the President was basically legislating without a delegation of authority. You're relating this to Youngstown? Absolutely, Your Honor. If you read our complaint in this case, we have a long discussion of Youngstown because this is a quintessential separation of powers problem. You have an agency, sort of this working group is functioning like an agency. It's issuing substantive policy decisions, dictating outcomes to other agencies. That's something that needs a delegation of authority and must go through those. That goes for actual decisions. I'm sorry, Your Honor. The steel mills were closed. Yes, yes. And in this case. . . No steel mill has been closed here. No steel mill has been closed. . . I mean analytic. Understood. By analogy. The point that I would make is. . . No, seriously. We have a concrete and particularized interest in being able to compete, participate in the future agency actions on an even playing field. Who has this ability? The states? The states, absolutely. What state agency has a right under the supremacy clause to participate? The state, under the terms of the APA itself, as emphasized and interpreted by the Supreme Court in Massachusetts against EPA, the states themselves have a procedural interest in participating in these various rulemakings. And as the city of Los Angeles against Arkansas. . . What agency here? I would say. . . Well, let me offer three points, Your Honor, on that point. First of all, is. . . The question is. . . Is this an agency within the meaning of the APA? Is the interagency working group an agency within the meaning of the APA? The standards for that are probably set forth best in Meyer against Bush and Saucy against David, the two cases that both the parties discussed on this issue in the various briefs that have been filed here. And where that agency has the ability to issue, quote, legally binding. . . That phrase is actually in Meyer against Bush. Legally binding decisions to other agencies, you're looking at something that is an APA agency. That is fundamentally different than the other working groups that we've dealt with in the past. No other working group could say, hey, EPA, you must do this. I just told you one that could. I'm sorry? I just told you one. It's gone now because of oil. . . International oil market has changed. But the mandatory oil import program had far more operative authority than this one. Well, the operative authority that I emphasize here is the injury we've already experienced by being denied the right to comment on this. And while we're exercising the right to comment when the second agencies act, that right to comment does not have the same meaning as it would have been if we'd been able to comment in the first instance. Because that second agency, as the government repeatedly concedes, must use these numbers. We can tell them, please don't use these numbers. They're really bad. And that second agency can say, thank you. We carefully consider that. But you know what? We're going to do what the President told us to. And that itself is a procedural violation of the APA. If your argument was right, the New England states would have been in court in a jiffy trying to enjoin the actions of the mandatory oil import program that favored the oil-producing states. I think the relevant New England state here is Massachusetts, which is the plaintiff in Massachusetts against EPA, where standing was upheld under a much more attenuated . . . They never sued to challenge the actions of the executive office of the President. Well, they sued the EPA on the theory that . . . No, I'm talking . . . A hundred years from now, they may have their coastline . . . I'm talking in the early 70s. No, I'm not aware they did in those days, Your Honor. I just don't know the answer to that question. In any event, I see I've almost used up my time. I'd emphasize there are only two cases that the parties have discussed where one agency dictates a binding result on an important part of the decision-making process for the second agency. One of them was this Bennet against Speer. And the Supreme Court held you get to sue the first agency. You do not have to wait until the second agency issues its final declaration. The other one is Regents where the Supreme Court said, you know what, you may not be able to sue the second agency. And based on those cases, we ask the Court to reverse here. Did you research FOIA or otherwise how many interagency working groups there are in the executive branch today? I don't have the number in front of me. I do think there is a . . . I do think that information may be posted on the White House website, but I don't know the specific number, Your Honor. But I do submit that none of them exercise this kind of authority. You say it. Thank you, Your Honor. But you can't point to an operative action they took. I can point . . . You can say that, yeah, it's heavy-handed guidance. I'll grant you that. This is something much more than heavy-handed guidance. This is binding. The executive order says shall. They shall use these. The President says you must. Agency 2, you must do what Agency 1 says. I mean, you're hypothesizing. You're hypothesizing the impact on actual agency decisions. I think in response to Judge Menendez's question, I pointed out two examples where we have it right there on the record. You've had no response to the complaints. That's true as to some of them. However, as to that light truck vehicle emission standard thing, and as well in the context of the hydrofluorocarbons, you can look right there on paper and see the high number for social costs of greenhouse gases justifying a massive increase in regulatory limits. What did the review in court say as to the rationality of that? I think that may have been what I was trying to say to Judge Menendez. There hasn't been a final judicial review of those. Some of those are being challenged in court, the like where a party to a challenge to the light truck case. But there hasn't been a final determination. And what Bennett says, I'd emphasize, what the Supreme Court holds in Bennett v. Speer is you don't have to wait until the second agency finalizes its process to sue when the first agency is issuing something that alters the legal regime that the second agency is engaging in. I understand. I know that. I mean, I've dealt with Bennett for years now. Yeah, I think it's a well-decided decision. I submit to the Court that it's controlling here. I say I'm well over my time. Without any further questions, thank you. Thank you.  I want to make sure that we talk about standing, which as the Fifth Circuit held does not exist in this type of challenge. But I did want to clarify one matter that I believe Judge Menendez asked about. Council talked about the 2023 EPA emission standards vehicle, emission standards for light-duty vehicles. And you asked whether the interim estimates had any kind of relationship to those standards. The final rule was clear on this. This is at 86 Federal Register at 74498. It said EPA weighed the relevant statutory factors to determine the appropriate standard and the analysis of monetized greenhouse gas benefits was not material to the choice of that standard. Specifically, in response to a comment made by Missouri, EPA said, this is on page 768 of the collected response to comments, EPA said, regardless of the method used in quantifying the benefits of greenhouse gas reductions for the purposes of this rulemaking, EPA would still adopt the standards of this final rule pursuant to its statutory obligations to set standards for pollutants that contribute to air pollution. A couple more things, if I may, that I think this particular rulemaking illustrates. Council said that agencies would just dismiss comments and say, well, we have to use these standards, so we're not going to engage with anything. In response to a comment, EPA said, EPA has carefully reconsidered for this rulemaking the technical support document, the underlying studies discussed in the technical support document, and the issues raised by the commenters. EPA concludes that as noted in section 3.3 of the RAA and elsewhere in this response to comments, the discussions in the TSD represent the appropriate considerations of the various issues. So EPA did look at those comments and seriously engage with them and concluded that the working group's technical support document was correct. And as a final note, I just wanted to emphasize that, as Council acknowledged, they are challenging this action. They're challenging this rulemaking. They're challenging it in the D.C. Circuit where challenges to this type of emission standard have to be brought under statute. Parties cannot challenge emission standards in district court in another circuit. So I think this particular rulemaking points to numerous problems with the plaintiff state's lawsuit here. Now, if I could, I'd like to turn to standing, if the Court has any questions on that issue. As both the Fifth Circuit and the district court here recognize, a fundamental problem with this challenge is that the interim estimates on their own do nothing to the plaintiff states. The plaintiffs worry that the estimates will be used to justify increased regulatory burdens, but if that happens, the injury, in fact, would be caused by that future regulation, and the plaintiffs could challenge that regulation in the appropriate court in the normal course. Opposing counsel relies heavily on Bennett v. Speer for the idea that, in that case, the harm was similarly affected by the kind of in-between steps or the interim guidance here, and that it supports their claim for standing, that they're far enough down the process that they can show they'll be harmed. What's your response to the applicability of Bennett? Bennett v. Speer is different in a number of key respects. There we had a specific agency project. It was an irrigation project. The biological opinion dealt specifically with that irrigation project, and under the statutory framework, as the Supreme Court explained, the biological opinion was virtually determinative on the action agency's course of conduct because the biological opinion made certain conduct that had previously been unlawful, it made it lawful when conducted in accordance with the biological opinion, and that's where the kind of virtually determinative aspect comes in. As the district court here explained, basically the biological opinion prescribed how the action agency could carry out the irrigation project. That had a concrete effect on the plaintiff's interest in the water usage, and that's what gave rise to standing there. Here, the interim estimates have no determinative effect on any administrative action. They don't require any regulation. They don't require that a regulation regulate in a certain way, so we really have that missing coercive or determinative effect. Well, opposing counsel relies heavily on the shall, that they shall be considered. Is your point that although they shall be considered, the weight given or the impact is unknown? That is certainly one aspect. So how they shall be considered, as the OIRA guidance makes clear, they have to be used in the RIA. This is the regulatory impact analysis that's conducted under Executive Order 12866. This is part of the executive branch's internal regulatory review process. So the prior executive order says that for certain significant actions, agencies have to undertake a cost-benefit analysis. Executive Order 13990 says agencies shall use the interim estimates when they monetize greenhouse gas emissions for the purpose of that internal analysis. Now, that is a totally separate question from whether the agencies must rely on cost-benefit analysis for the particular rulemaking. And this is the kind of disconnect we saw in the emission standards rule, where EPA said the analysis of the monetized greenhouse gas benefits was not material to the choice of that standard. So sometimes agencies will carry out a cost-benefit analysis because they have to, to comply with EO 12866, but that won't be relevant to the final decision they make. Another example that the plaintiffs talk about are the national ambient air quality standards. This is the cooperative federalism program they talk about. That statute concerns standards for certain pollutants related to smog. There are no standards for greenhouse gas emissions. When the agency, when EPA conducts a rulemaking under this program, as part of its kind of overall cost-benefit analysis, it will look to collateral or ancillary benefits of the rulemaking. And so the greenhouse gas emissions will be considered there. But these won't have any role in the actual rulemaking because the statutory framework is concerned with different pollutants. And again, EPA explained this in that rulemaking. In response to a comment, they said, information from the working group used to estimate climate benefits is not relied upon as part of the record basis for this rulemaking. So I think Your Honor points to exactly one of the disconnects, that this may be used for one purpose and agencies shall use it for that purpose, but that has no causal connection to the eventual regulation that's adopted. Thank you. We have other standing and rightness arguments in our brief, but I assume the court is well familiar with those. So if there are no further questions, I would ask that the judgment of the district court be affirmed. Thank you. Thank you. Thank you. I'll give you a minute for rebuttal. None of us can enjoy the COVID protocol. None of us can enjoy the COVID protocol. Your Honor, thanks for the accommodation of a minute of rebuttal. I think the only point I'd make on rebuttal is, in response to the question of the President directing them to consider them, the word in the executive order is not considered to use. These agencies shall use these when monetizing the cost of greenhouse gases and rulemakings and other agency actions. So what the executive order says in its plainsterm is, these are the numbers that you must use. It's the conclusion you must reach, not a factor that you must consider in the course of trying to make these calculations, but this is the end result of the calculation. And I think that emphasizes the point that I'd emphasize here, that we had the right procedurally to comment on these when they were formulated in the first instance. That right was deprived, and our ability to comment when future agencies are acting is not meaningful in the same sense as it would have been if we could have gone to the agency that was making the binding determination in the first place. And so with that, I'd ask the court to reverse the judgment law. Thank you. Thank you. Thank you, counsel. The case has been thoroughly briefed and very well argued. Of great interest and uniqueness, so we will take it under advisement.